## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

AMERICAN CIVIL LIBERTIES UNION OF
MASSACHUSETTS and AMERICAN
OVERSIGHT,

          Plaintiffs,

v.

U.S. IMMIGRATION AND CUSTOMS
ENFORCEMENT,

          Defendant.

C.A. No. 1:21-cv-10761-AK

## MEMORANDUM IN SUPPORT OF
## RENEWED MOTION FOR DISCOVERY

## INTRODUCTION

In this FOIA case, ICE took the unusual position that it should be excused from searching an entire category of records because they were destroyed by ICE's personnel. The Court denied ICE's motion for summary judgment. The Court also declined to order immediate discovery. Instead, the Court gave the agency an opportunity to submit additional declarations to explain what happened. ICE did so.

ICE's supplemental declarations not only fail to answer the Court's concerns, but they also raise serious new questions about ICE's purported destruction of these records. Why did ICE order the deletion of text messages and other mobile device data in 2017? Does any data remain on the five relevant devices for which the "lines were confirmed deactivated," and has ICE even looked to check? How can ICE contend that these devices were deactivated in the ordinary course of personnel leaving the agency, when *none* of the devices were deactivated within six months of its

1

custodian's departure?  Indeed, most of these devices were purportedly deleted while the agency took no action on the plaintiffs' FOIA request for over a year, and after the plaintiffs had won their administrative appeal that required ICE to respond.

Similarly, for Ms. Asher's device (which has been located), the declarations raise the questions of what texting applications are preserved on that device, what applications did ICE search, and why did it search only for messages exchanged with the other six named custodians? For Mr. Feere's device (which has also been located), why can't ICE access his government-issued phone without his cooperation, and, even in the absence of his voluntary cooperation, could he be required to provide his passcode or biometric identifier in deposition?  The answers to these questions are important to help the parties and the Court understand what happened here, whether the unavailability of any data can be remedied, and whether ICE has met its burden to show a reasonable and good faith effort to collect the requested records.

The Court has already ordered the preservation of the relevant devices to prevent any further deletion and to preserve the status quo.  *See* Sept. 1 & Oct. 5, 2022 Orders (D.E. 60 & 66). Plaintiffs respectfully request to take the next logical step by exploring—through limited, focused discovery—what data remains, what has been deleted, and when and why any deletions occurred. To that end, the plaintiffs propose that the Court authorize a discovery period for plaintiffs to take the following targeted discovery:

1. <u>One set of interrogatories, of up to five (5) questions.</u>  Plaintiffs anticipate that these interrogatories would include questions to:

   a. identify the dates of each named custodian's employment at ICE, and their position(s) during that time;

   b. identify (e.g., by serial number or other unique identifier) the government-issued mobile devices used by each named custodian during their employment at ICE;

    c.  clarify the timeline for the issuance, return, and deactivation of the relevant devices, as well as the deletion and/or preservation of any data contained on them;

    d.  clarify whether ICE has actually examined the relevant devices that were purportedly deactivated, and, if so, the nature of that examination and whether any data was ultimately located on the device; and

    e.  identify the categories of data retained on Nathalie Asher's mobile device (which ICE says was retained and is accessible), and the scope of any searches of that data to date.

2. <u>One set of document requests, of up to six (6) requests.</u>  Plaintiffs anticipate these requests would include requests for:

    a.  policies, procedures, and instructions concerning the deletion or preservation of mobile device information in effect from 2015 to 2021, to the extent not already produced;

    b.  records of how ICE promulgated the November 2017 "IOS Device Data Wiping Quick Reference Guide" to its employees, such as any cover memorandum or instructions that accompanied the guide;

    c.  any orders, logs, correspondence, and other documents that record the issuance, return, and/or deactivation of the relevant mobile devices, and the deletion of any data contained on them;

    d.  communications and other records documenting the reasons for any deactivation or deletion of the relevant devices and/or data contained on them;

    e.  records, if any, of the processing of this FOIA request prior to the filing of this lawsuit; and

    f.  ICE's recent communications with its former employee Jon Feere about accessing his government-issued mobile device.

3. <u>A deposition of up to four (4) hours of ICE's declarant Richard Clark, to be held at a mutually convenient location in Washington, D.C.</u>

    a.  Plaintiffs anticipate the deposition would include gathering certain clarifying information about:

        i.  the factual assertions in his declarations;

       ii.  the methodology he used to reach those conclusions;

iii.   ICE's policies and procedures; and

iv.   ICE's technical capabilities to access, search, and preserve mobile device data.

4.   <u>A Rule 45 deposition of up to three (3) hours of Jon Feere.</u>

a.   ICE is reportedly unable to unlock Mr. Feere's government-issued device, and Mr. Feere is reportedly refusing to provide the access code until ICE meets certain demands in an unrelated case.  Mr. Feere should not be permitted to hold government records hostage from his former government employer and from the public.  Plaintiffs will use this deposition to gather the access code, as well as to gather information about the origin of the phone (which ICE says a different agency issued) and Mr. Feere's practices for using electronic devices in his work. *Plaintiffs request that ICE be directed to bring Mr. Feere's government-issued mobile device(s) to the deposition, so that any access codes provided by Mr. Feere and any biometric access option (e.g., face or fingerprint) can be tested in real time.*

Plaintiffs respectfully suggest that this limited, focused discovery would materially aid the parties and the Court in evaluating whether ICE has met its burden in this case.  Plaintiffs believe the proposed discovery could be completed within 90 days, after which the Court could hold a scheduling conference and set dates for a final round of dispositive motions.

## FACTUAL AND PROCEDURAL BACKGROUND

*1.  Plaintiffs are investigating whether federal officials pursued the indictment of a Massachusetts judge in order to improperly pressure state judges to exercise their powers in ICE's favor.*

In April 2019, the federal government indicted a Massachusetts judge for obstruction of justice.  *See* Oehlke Decl. Ex. C (Indictment).  The charges were based on an order the judge had allegedly issued from the bench in April 2018.  *See id.*  The federal government alleged that this order ultimately made it harder for ICE agents to arrest a state court defendant for civil immigration purposes.  *See id.*  At the time, there was an ongoing public debate over whether and how ICE agents would be permitted to arrest people in and around Massachusetts courthouses, and whether

4

and how Massachusetts judges, court staff, and prosecutors would cooperate in those efforts.  *See* Pl.'s Mot. Summ. J. (D.E. 31) at 1 (citing *Lunn v. Commonwealth*, 477 Mass. 517 (2017) & *Ryan v. ICE*, 382 F. Supp. 3d 142 (D. Mass. 2019), *vacated on other grounds* 974 F.3d 9 (1st Cir. 2020)). The indictment raised serious concerns that ICE and federal prosecutors were leveraging the criminal process to pressure Massachusetts judges to exercise their powers in ICE's favor.  *See* Pl.'s Mot. Summ. J. (D.E. 31) at 1-3 (factual background).

These concerns are well-founded.  The government has candidly admitted that it has *never* brought *any* charge like this against *any* judge, in the absence of a bribery allegation.  *See* Oral Argument, *United States v. Joseph*, No. 20-1787 (1st Cir.) at time 27:45, http://media.ca1.uscourts.gov/files/audio/20-1787.mp3.  Yet ICE's Principal Legal Advisor at the time, Tracy Short, celebrated the indictment as "a great day" and "the first of many?"  *See* Oehlke Decl. Ex. Q at 2021-ICLI-00041 05, 62.

Now—after holding charges over the head of a Massachusetts judge for years—the federal government has finally dismissed the indictment.  *See* Sept. 23, 2022 Order (D.E. 178), *United States v. Joseph et al.*, Cr. No. 19-10141 (D. Mass.).[1]  Nevertheless, the long pendency of the indictment itself caused the judge to be suspended from all judicial duties for more than three years.  *See* Apr. 25, 2019 Order (D.E. 1) & Nov. 16, 2022 Order (D.E. 17), *In re: Shelley M. Joseph*, Docket No. OE-0140 (Mass.).  It is hard to imagine a more chilling example of an

---

[1] All counts against the judge were dismissed, and the underlying incident was referred by agreement to the Massachusetts Commission on Judicial Conduct.  *See* Agreement (177-1), *United States v. Joseph et al.*, Cr. No. 19-10141 (D. Mass.).

All counts against a co-defendant were also dismissed, except for one perjury count that is the subject of a deferred prosecution agreement for six months, after which it will also be dismissed if the co-defendant complies with the terms of the agreement.  *See* Deferred Prosecution Agreement (D.E. 177-2), *United States v. Joseph et al.*, Cr. No. 19-10141 (D. Mass.).

"enormous looming burden that could not help but serve as an 'external influence or pressure'" on Massachusetts judges. *See In re Enforcement of Subpoena*, 463 Mass. 162, 172 (2012).

Consequently, although the prosecution of the judge has concluded, plaintiffs' investigation into the origins of that prosecution, and the public's interest in that investigation, continues.  Among other things, the public record indicates that the prosecution originated at the highest levels of ICE leadership.  Thomas Homan—who was the Acting Director of ICE in early 2018—reportedly told the *New York Times* that he learned of the alleged incident "the same day it happened" from Matthew Albence (then the director of ICE's Enforcement and Removal Operations division), and communicated with his staff about pursuing an indictment.  *See* Oehlke Decl. Ex. B (D.E. 33-2).  Likewise, a new tranche of records produced by ICE this week indicates that ICE's Homeland Security Investigations ("HSI") division "led [the] investigation."  *See* McFadden Decl. Ex. A (2021-ICLI-00041 460-61).[2]  Accordingly, as described below, plaintiffs are seeking various records about the origination of the prosecution from ICE through FOIA, including text and email communications to or from people serving as ICE's senior officials.

  2. *ICE has known since November 2019 that plaintiffs are seeking text messages as part of their investigation.*

On November 18, 2019, two days after the *Times* published Homan's comments, plaintiffs submitted the FOIA request at issue in this case.  Among other things, that request sought "text messages . . . concerning Judge Joseph, Officer MacGregor, and/or the events alleged in the Indictment" from seven named custodians (or others communicating on their behalf).  *See* Oehlke Decl. Ex. C (D.E. 33-3).  Those custodians were Thomas Homan, Matthew Albence, Ronald

---

[2] Now that the criminal charges are dismissed, ICE has withdrawn its assertion of exemption 7(A), which shields certain documents relating to ongoing investigations and prosecutions.  As a result, on December 15, 2022, ICE produced 376 pages of records that appear to be drawn from HSI's investigative file, as well as 12 pages of previously produced emails with the 7(A) redactions lifted.

Vitiello, Thomas Blank, Tracy Short, Jon Feere, and Nathalie Asher, all of whom were senior ICE officials at various times between April 2018 and January 20, 2021. *See id.*

On November 19, 2019, ICE responded to plaintiffs that it would not immediately "initiate a search for responsive records," due to a purported requirement for "third party authorization." *See* Oehlke Decl. Ex. D (D.E. 33-4). On November 25, 2019, the plaintiffs responded that they disagreed. *See id.* Ex. E (D.E. 33-5). ICE construed this as an administrative appeal. *See id.* Ex. F (D.E. 33-6). Three months later, on February 20, 2020, the Chief of ICE's Government Information Law Division, who is part of the Office of ICE's Principal Legal Advisor, ruled in favor of plaintiffs' appeal and remanded the matter to ICE's FOIA office with an order to "obtain any responsive documents, should they exist." *See* Oehlke Decl. Ex. G (D.E. 33-7). That same letter informed the plaintiffs that "[t]he ICE FOIA Office will respond directly to you." *Id.*

But the ICE FOIA Office did not, thereafter, respond directly to the plaintiffs; instead, it went silent for well over a year. On May 10, 2021, having heard nothing further, plaintiffs filed this lawsuit. As is typical in FOIA lawsuits, the case proceeded to an initial round of summary judgment briefing without any prior fact discovery.

3. *ICE failed to meet its burden at summary judgment to show a reasonable, good faith search for the text messages.*

In a February 2022 motion for summary judgment, ICE acknowledged its obligation to prove "a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested." *See* ICE's Mot. Summ. J. (D.E. 26) at 4 (quoting *Oleskey v. DOD*, 658 F. Supp. 2d 288, 294 (D. Mass. 2009)). However, ICE argued it should not have to search for the requested text messages, essentially because the messages would only be stored on the mobile devices and, "during the timeframe in question . . . it was standard practice at ICE to factory reset/securely wipe/destroy and delete all contents of mobile

phone devices as they were being taken out of service." *See* Clark Decl. ¶ 16 (D.E. 37-2).  ICE represented to the Court that "there are no copies of text messages with ICE" and "the text messages no longer exist because they were destroyed under ICE policy." *See* ICE's Reply and Cross-Opp. (D.E. 37) at 8-9.

That was a surprising representation. Not only does the law require the preservation of public records, but also an agency's communications about an ongoing criminal matter must be preserved for a variety of additional reasons.[3]  Plaintiffs thus requested to take "limited focused discovery" on the issue, in order to prepare an adequate factual record for the Court.  *See* Pl.'s Reply (D.E. 39) at 2, 4-5 (citing *ACLU of Mass. v. ICE* (*"ACLUM"*), 448 F. Supp. 3d 27, 44-46 (D. Mass. 2020)).

During the summary judgment hearing in April 2022, the Court questioned whether ICE could be found to have responded to the FOIA request reasonably and in good faith because ICE had not provided complete information about its deletion activities, and because potentially responsive text messages may have been deleted after the FOIA request was filed.  *See, e.g.*, Apr. 26, 2022 Tr. at 11-17 ("The Court: I guess I keep coming back to if it was ICE's intention to delay, delay, delay to the point that they are destroyed, wiped clean and no longer available, is that still good faith?").

---

[3] *See, e.g.*, *Brady v. Maryland*, 373 U.S. 83 (1963) (material exculpatory evidence); *Giglio v. United States*, 405 U.S. 150 (1972) (material impeachment evidence); 18 U.S.C. § 3500 (prior statements of government witness); Fed. R. Crim. P. 16(a)(1)(E) (producing documents and objects to defendant); D. Mass. L.R. 116.2 (disclosing exculpatory evidence to defendant), 116.4 (disclosing audio/video recordings to defendant) & 116.9 ("All contemporaneous notes, memoranda, statements, reports, surveillance logs, recordings, and other documents (regardless of the medium in which they are stored) memorializing matters relevant to the charges contained in the indictment made by or in the custody of any law enforcement officer whose agency at the time was formally participating in an investigation intended, in whole or in part, to result in a federal indictment shall be preserved until the entry of judgment unless otherwise ordered by the court.").

In June 2022, the Court denied the parties' cross-motions for summary judgment without prejudice. Although the Court declined plaintiffs' request to take discovery at that time, it ordered ICE to file a supplemental declaration providing more specific information. *See* Jun. 3, 2022 Mem. and Order (D.E. 48) at 14, 18. The Court explained that "[t]his specificity is necessary for the Court to determine whether ICE's non-collection of text messages is reasonable, and further, whether ICE's lengthy delay between its receipt of the Request in November 2019 and its initiation of records collection in the spring and summer of 2021 contributed to the unavailability of text message records." *See id.* at 14.

As described in the Argument section below, ICE has since filed new declarations, but they do not resolve the concerns raised at summary judgment—quite the opposite, in fact.

## **ARGUMENT**

*1. ICE now asserts that it erased many of the relevant mobile devices after the FOIA request was submitted and outside the ordinary course of personnel turnover.*

Last August, ICE filed two new declarations in response to the Court's Order. *See* Second Suppl. Schurkamp Decl. (D.E. 55); Suppl. Clark Decl. (D.E. 56). These new declarations do not assist ICE in meeting its burden, or clarify the concerns raised by the Court. To the contrary, they raise numerous serious questions about ICE's response to the FOIA request, including because they indicate that ICE deleted many of the relevant devices after the FOIA request was filed.

First, the new declarations confirm that the text messages are likely to be found only on the mobile devices that sent or received them, because ICE had no general practice to preserve them anywhere else. ICE's Policy Directive 141-03 acknowledges that ICE officials use text messages for official communications, and does not order that copies of those text messages be preserved separate from the mobile devices on which they are created or received. *See* Second Suppl. Schurkamp Decl. Ex. B (D.E. 55-2). The policy does not require that the messages

themselves be preserved, even if they meet the definition of a "record" under the Federal Records Act. *See id.* At most, it encourages ICE officials to create a separate "memo to the file" describing certain categories of communications made via text or chat. *See id.* But there is no evidence that this honor system works. The government has produced no evidence that any relevant ICE official ever wrote a single one of these "memos to the file" to describe text communications on their government-issued mobile devices.

Second, the new declarations reveal that, in the first year of the Trump Administration, ICE affirmatively *instructed* all of its officials and employees to "wipe/erase all data" from their government-issued devices before returning them to the agency. *See* Suppl. Clark Decl. Ex. B (D.E. 56-2). If a phone was locked or damaged, ICE personnel were ordered to physically destroy it in a shredder. *See id.* ICE has never explained why it issued this directive. But its impact is clear enough.

Third, the new declarations admit that ICE never issued a "hold" notice or "directive[] . . . to preserve" the documents sought by the underlying FOIA request and in this litigation. *See* Second Suppl. Schurkamp Decl. ¶ 7 (D.E. 55). Indeed, one of the new declarations states that "ICE does not have a policy or practice of issuing litigation holds in FOIA litigations" at all. *See id.* This practice implicates exactly the concerns raised by the Court at the summary judgment hearing. *See* Apr. 26, 2022 Tr. at 11-17. If ICE has structured its operations such that text messages are stored only on mobile devices, and if ICE has ordered its personnel to periodically erase those devices, and if ICE takes no steps to suspend that order upon receipt of a FOIA request or lawsuit—or even the commencement of a prosecution in which ICE may be involved—then ICE appears to risk destroying messages even after they are sought in a FOIA request or lawsuit.

Fourth, the new declarations raise questions about whether five of the seven named custodians—Homan, Albence, Short, Vitiello, and Blank—have actually deleted the data from their agency-issued mobile devices. *See* Suppl. Clark Decl. ¶¶ 14-15 & n.5 (D.E. 56). ICE does not assert that anyone has actually looked at these devices to see if the custodians did, in fact, fully wipe them. Rather, ICE appears to infer that they are deleted because the "lines were confirmed deactivated." *See id.* However, ICE's declarants do not explain why deactivating service to a mobile phone necessarily destroys the texts and other data that may have been saved to the device itself. If ICE could delete the contents of a phone simply by deactivating service to it, then presumably ICE would have no need to separately instruct officials to delete their phones by "wiping" them. Yet ICE gave that instruction. *See* Suppl. Clark Decl. Exs. A & B (D.E. 56-1 & 56-2). Consequently, ICE has not established that these devices lack any relevant data.

Fifth, putting aside ICE's assertions about what "deactivation" connotes, the new declarations raise the question of why ICE purportedly deleted four of the custodians' devices *after* receiving plaintiffs' FOIA request seeking data from those devices. *See* Suppl. Clark Decl. ¶ 14 (D.E. 56) (Albence: Feb. 19, 2020; Blank: May 21, 2020; Vitiello: Dec. 16, 2020; Short: Jan. 19, 2021). Three of these deactivations (Blank, Vitiello, and Short) occurred *after* ICE had lost the administrative appeal and had been specifically *instructed* by the office of its own Principal Legal Advisor that it was required to "obtain any responsive documents." *Compare id.*, *with* Oehlke Decl. Ex. G (D.E. 33-7) (dated Feb. 20, 2020). ICE has argued that these devices were "deactivated in the normal course of ICE business as regards to employees leaving." *See* Mot. to Reconsider (D.E. 62) at 7. But that claim is not supported by any of the asserted facts—it appears that *none* of the five "deactivated" devices were deactivated at the time of the custodian's departure from the agency:

- Acting Director Thomas Homan departed ICE effective June 30, 2018.  *See* Oehlke Decl. Ex. T (D.E. 33-20).  ICE contends that his device was deactivated *more than six months later*, in February 2019.  *See* Suppl. Clark Decl. ¶ 14 (D.E. 56).

- Ronald Vitiello was immediately appointed to replace Homan as Acting Director in June 2018.  *See* Oehlke Decl. Ex. T (D.E. 33-20).  ICE does not contend that Vitiello's device was deactivated upon his apparent departure from the agency when Mr. Albence became Acting Director in April 2019.  *See* Oehlke Decl. Ex. U (D.E. 33-21).  Rather, ICE contends that Vitiello's device was deactivated *more than a year and a half later*, in December 2020.  *See* Suppl. Clark Decl. ¶ 14 (D.E. 56).

- Matthew Albence was (except for one brief interruption) the Acting Director of ICE from April 2019 until his retirement in or around July 31, 2020.  *See* Oehlke Decl. Ex. U (D.E. 33-21).  Yet ICE contends his mobile device was deactivated more than six months *before* he left the agency.  *See* Suppl. Clark Decl. ¶ 14 (D.E. 56).

- According to a public LinkedIn profile,[4] Thomas Blank departed ICE in June 2019, but ICE contends that his device was purportedly deactivated almost a year later in May 2020.  *See* Suppl. Clark Decl. (D.E. 56) ¶ 14.

- According to a Department of Justice press release archived by the American Immigration Lawyers Association (AILA),[5] ICE's Principal Legal Advisor Tracy Short became the Chief Immigration Judge for the Executive Office of Immigration Review (EOIR) in July 2020.  Yet ICE contends that his device was not deactivated until six months later on January 19, 2021, the day before President Biden's inauguration.  *See* Suppl. Clark Decl. (D.E. 56) ¶ 14.

In summary, ICE's suggestion that devices were deactivated by departing officials in the normal course of business simply makes no sense.  ICE has offered no alternative explanation.

Sixth, the new declarations suggest that not all devices have been accounted for.  As described above, ICE contends that Acting Director Matthew Albence's mobile device was deactivated more than six months *before* he left the agency.  *See* Suppl. Clark Decl. ¶ 14 (D.E. 56).  Unless ICE is contending that its Acting Director did not have a government-issued phone for

---

[4] *Tom Blank*, LinkedIn,   https://www.linkedin.com/in/tom-blank-024a854   (last visited Dec. 21, 2022).

[5] *EOIR Announces New Chief Immigration Judge*, July 2, 2020, *available at* https://www.aila.org/infonet/eoir-tracy-short-chief-immigration-judge.

more than half a year, one or more of Albence's devices is not accounted for. ICE does not say if a later-issued device exists. If it does, then Albence's mobile device data (including his texts) may have been transferred to the new device at the time of issue, and may therefore be retrievable if the later-issued device can be located.

Seventh, ICE located Nathalie Asher's device in its Office of Professional Responsibility, which, among other things, "is responsible for investigating allegations of employee misconduct." *See* Second Suppl. Schurkamp Decl. ¶¶ 12-13. ICE contends that it searched that device. *See id.* ¶ 14. However, ICE does not specify which applications it searched (*e.g.*, SMS messaging, messaging apps like Signal or WhatsApp, etc.), and states that it only searched "text messages *between Natalie Asher and other custodians named in Plaintiffs' FOIA Request*." *See id.* (emphasis added). This raises the question of whether all texting applications were searched, and whether the device contains texts with other people (besides the other named custodians) that could be searched for responsive records. Demonstrating such a search is necessary to meet ICE's burden because plaintiffs' request was not limited to only communications between or among the named custodians.

Lastly, ICE has now located Jon Feere's device. *See* Suppl. Clark Decl. ¶ 15 (D.E. 56). ICE states that Feere's device was "issued outside of the normal procedures i.e. carried over from a previous agency." *See id.* ICE reports that his phone is locked. *See id.* According to ICE's recent status report, the agency contacted Mr. Feere for the code, and he "was generally unwilling to assist ICE absent concessions from ICE in unrelated litigation with which Mr. Feere is involved." *See* Status Report (D.E. 65) at 1-2. In other words, it appears that Mr. Feere is holding the data hostage pending some desired action from ICE in another matter. ICE reports that Mr.

Feere's cooperation is necessary, because it will take up to 22 years to unlock the phone via random

passcode attempts.  *See id.* at 2.

> 2. *The Court can order discovery to develop the record for summary judgment and to determine whether purportedly deleted records can be reconstructed.*

In a FOIA case, the Court is empowered to order discovery in at least two circumstances.

First, the Court may order discovery to develop an adequate record for summary judgment,

particularly where the agency has already failed once to meet its burden and its submissions raise

unanswered questions.  *See, e.g. ACLUM*, 448 F. Supp. 3d at 44 (ordering "limited focused

discovery" where ICE had failed to meet its summary judgment burden, and collecting cases)

(Sorokin, J.); *Landmark Legal Found. v. EPA*, 959 F. Supp. 2d 175, 184 (D.D.C. 2013) (ordering

"limited discovery" where "outstanding issues of fact preclud[e] summary judgment" and record

"may indicate bad faith on the part of the agency"); *El Badrawi v. DHS*, 583 F. Supp. 2d 285, 321

(D. Conn. 2008) (authorizing "limited discovery" where agency failed to meet its burden to

establish adequacy of searches), *abrogated on other grounds by Spadaro v. CBP*, 978 F.3d 34, 45

(2d Cir. 2020).  For example, in *ACLUM*, Judge Sorokin ordered discovery where, like this case,

ICE had not adequately explained why it did not search the local devices of certain custodians.

*See* 448 F. Supp. 3d at 43-44.  Similarly, in *El Badrawi*, the court authorized depositions of ICE

personnel where its declarations did not adequately explain why it did not search all available

record systems.  *See* 583 F. Supp. 2d at 306-07, 321-22.  And in the 2013 *Landmark Legal

Foundation* decision, the court allowed "limited discovery" because there, like here, the agency

structured its operations in a manner that "raises the possibility that leaders in the [agency] may

have purposefully attempted to skirt disclosure under the FOIA."  *See* 959 F. Supp. 2d at 184.  In

summary, where summary judgment has been denied and supplemental declarations have proven

inadequate, limited discovery is appropriate to prepare an adequate record for judicial review.  *See*

*ACLUM*, 448 F. Supp. 3d at 44-45 (authorizing discovery, including depositions, "in order to develop the record necessary" for renewed summary judgment briefing).

Second, the Court may order discovery where there is reason to believe the agency destroyed potentially responsive records after the request was filed. *See Judicial Watch v. U.S. Dep't of Com.*, 34 F. Supp. 2d 28, 46 (D.D.C. 1998) (authorizing "supervised discovery" into "the destruction or removal of documents after [the plaintiff's] first FOIA request was filed"); *CREW v. Dep't of Veterans Affs.*, 828 F. Supp. 2d 325, 334 (D.D.C. 2011) (ordering discovery into agency actions that rendered backup tapes unusable).  In *CREW*, for example, the plaintiff submitted the request in May 2008.  *See* 828 F. Supp. 2d at 327.  During the subsequent litigation, the VA reported that, from January to December 2008 (including during the pendency of the FOIA request), it had switched from "monthly" backup tapes to "daily, unlimited retention" backup tapes.  *See* 828 F. Supp. 2d at 332-33.  The VA contended that emails from that time period were no longer available because, at the end of that period, the VA reverted back to "monthly" backup tapes in a manner that "rendered all of the daily, unlimited retention, backup tapes . . . unusable." *See id.* at 333.  The court consequently ordered discovery "for the purpose of obtaining discovery regarding the circumstances of the suspension of normal operations as it relates to this case and whether the explanation for the suspension is document destruction or something else."  *Id.* at 334. Some courts have also indicated they could order discovery to explore the possibility of reconstructing deleted information, if the agency had not already taken such steps voluntarily.  *See Landmark Legal Found. v. EPA*, 272 F. Supp. 2d 59, 66-67 (D.D.C. 2003) (indicating court might order reconstruction of deleted records, except that the agency had already voluntarily attempted to remedy the injury "by providing access to top EPA officials—including [the former administrator]—for deposition, by initiating an investigation by the Inspector General, and by

15

recovering information from the reformatted hard drives to the extent possible"); *Jefferson v. Reno*, 123 F. Supp. 2d 1, 5 (D.D.C. 2000) (considering request to order agency to recover substitute records from third parties, but finding the issue moot when the agency agreed to do so).

Although the government routinely objects to FOIA discovery, the District of Massachusetts is no stranger to the concept. As noted above, in 2020, Judge Sorokin relied on the first of the two justifications described above to order "limited focused discovery" after denying ICE's summary judgment motion in *ACLUM*, 448 F. Supp. 3d 27. The court reasoned that ICE's initial summary judgment affidavits had been "insufficient to establish that the agency 'made a good faith effort to conduct a search for the requested records,'" given the "disconnect between ICE's description of its employees' data storage practices and its account of the search procedure" in response to the request. *Id.* at 43-44 (quoting *Oleskey v. DOD*, 658 F. Supp. 2d at 294). Specifically, although ICE had identified various hard drives and other local storage devices that might contain responsive records, it had limited its search to email accounts and "shared folders" on its network. *Id.* at 43. Similarly, ICE had failed to search the hard drive and other records of one of the named custodians. *Id.* at 43-44. As a result, "the affidavits before the [c]ourt [did] not contain information sufficient to demonstrate that ICE undertook a good-faith effort to design a search." *Id.* at 44. The court therefore denied ICE's motion for summary judgment and authorized ACLUM to "take limited focused discovery, including depositions of [points of contact] who were tasked with conducting searches in the relevant ICE program offices, in order to develop the record necessary" to resolve the questions presented on summary judgment. *Id.* at 44.

3.  *The Court can and should order limited focused discovery in this case.*

Here, the case for discovery is substantially stronger than in the 2020 *ACLUM v. ICE* decision, because discovery is necessary both to fill out the summary judgment record and to explore the possibility that responsive records were destroyed.

By November 2019 ICE was aware of the FOIA request at issue here, and by February 2020 it recognized its duty to "obtain any responsive documents."  *See* Oehlke Decl. Ex. D (D.E. 33-4), Ex. G (D.E. 33-7).  ICE also knew that its officials used text messages for official business.  *See* Second Suppl. Schurkamp Decl. Ex. B (D.E. 55-2).  Yet ICE specifically structured its operations to ensure that mobile devices would be periodically deleted, and that no copies of the text messages sent or received from those devices would be routinely archived anywhere else. *See* Clark Decl. ¶ 16 (D.E. 37-2); Suppl. Clark Decl. Ex. B (D.E. 56-2); Second Suppl. Schurkamp Decl. Ex. B (D.E. 55-2).  Compounding this problem, ICE apparently adopted a policy or practice of failing to issue "hold" instructions in response to either FOIA requests or even to ongoing or anticipated FOIA litigation.  *See* Second Suppl. Schurkamp Decl. ¶ 7 (D.E. 55).  ICE's own instructions and procedures created a massive systemic risk (or perhaps a systemic certainty) that work-related text messages would be deleted with the passage of time, even when the messages were the subject of a FOIA request or pending litigation.[6]  It is thus hardly surprising—given ICE's delay in responding to this request—that ICE felt confident to claim initially that "there are no

---

[6] ICE has more recently argued that any delay in processing plaintiffs' request is simply the natural result of its FOIA backlog, not an indication of bad faith.  *See* Mot. to Reconsider (D.E. 62) at 4-5. In this particular case, the record establishes that ICE was, in fact, aware of and processing the plaintiffs' request the day after it was filed, and was specifically ordered to collect responsive records three months later.  But if it truly believed it was so inundated with FOIA requests that it could not process them in a timely fashion, then its decision to set up a structure resulting in the periodic deletion of records, inevitably resulting in the deletion of records subject to pending FOIA requests or litigation, calls its good faith into question.

copies of text messages with ICE" and "the text messages no longer exist because they were destroyed under ICE policy."  *See* ICE's Reply and Cross-Opp. (D.E. 37) at 8-9.

At the summary judgment argument, the Court flagged that this arrangement raised questions as to ICE's good faith in responding to FOIA requests.[7]  *See, e.g.*, Apr. 26, 2022 Tr. at 11-17.  And in denying summary judgment, the Court ruled that ICE had not met its burden, including because it had "not provided any detail on when the phones the custodians used during the Request period were deactivated, and whether any steps were taken to preserve data at the time of deactivation."  June 3, 2022 Order (D.E. 48) at 14.  The Court further explained that "[t]his specificity is necessary for the Court to determine whether ICE's non-collection of text messages is reasonable, and further, whether ICE's lengthy delay between its receipt of the Request in November 2019 and its initiation of records collection in the spring and summer of 2021 contributed to the unavailability of text message records."  *Id.*

Although the Court could have ordered discovery at that point, *see ACLUM*, 448 F. Supp. 3d at 43-44, the Court offered ICE a chance to cure these deficiencies by filing one or more supplemental declarations.  *See id.* at 14-15.  ICE accepted that invitation.  But its supplemental declarations do not prove ICE's reasonableness.  Quite the opposite: as described above, the two supplemental declarations raised a series of serious, unanswered questions about ICE conduct.

---

[7] There are other reasons to question ICE's good faith in responding to this request.  At summary judgment, plaintiff argued that ICE had unreasonably failed to search HSI for responsive records, and ICE argued that it should not have to because plaintiffs were engaging in mere "speculation that more documents must exist" there.  *See* Gov't's Summ. J. Opp. (D.E. 37) at 9-10.  ICE knew the presence of an investigative file at HSI was not mere speculation.  ICE's production this week reveals that, at the time of the summary judgment briefing, ICE had already retrieved and reviewed an email stating that "[t]his is an HSI led investigation," but had redacted that portion of the text before producing it to the plaintiffs.  *Compare* Oehlke Decl. Ex. Q (D.E. 33-17) at 2021-ICLI-00041 75-76 (3:57 PM email fully redacted), *with* McFadden Decl. Ex. A at 2021-ICLI-00041 460-461 (produced Dec. 15, 2022, with redaction lifted to reveal: "This is an HSI led investigation . . . .").

Why did ICE order the deletion of text messages in 2017?  Does any data remain on the five devices where the "lines were confirmed deactivated?"  Has ICE looked at those devices to check?  How can ICE contend that these devices were deactivated in connection with personnel leaving the agency when *none* of the devices were deactivated within six months of its custodian's departure?  Why, in fact, were these devices deactivated and/or deleted?  Where is the device that Mr. Albence used during his last six months at ICE, and does it contain data from the prior time period?  What types of text messages are preserved on Ms. Asher's device, what texting applications did ICE search, and why did it search only for messages exchanged with the other six named custodians?  Why is ICE unable to unlock Mr. Feere's government-issued phone without his cooperation?

Accordingly, ICE has not only failed to meet its burden, but has also raised a series of new material factual questions concerning the reasonableness and good faith of its response to this FOIA request and its systemic practices.   Plaintiffs respectfully assert that the Court's consideration of renewed motions for summary judgment would benefit from a more developed factual record.  *See ACLUM*, 448 F. Supp. 3d at 44-45 (authorizing discovery, including depositions, "in order to develop the record necessary" for renewed summary judgment briefing).  Similarly, ICE's proffered explanation that the devices were "deactivated in the normal course of ICE business as regards to employees leaving," *see* Mot. to Reconsider (D.E. 62) at 7, is totally at odds with the relevant timeline—and discovery is appropriate to determine whether or not these devices were actually wiped, why ICE had a policy requiring that to occur, and whether these devices were wiped pursuant to that policy or for some other reason.  *See CREW*, 828 F. Supp. 2d at 334; *see also Judicial Watch*, 34 F. Supp. 2d at 46 ("Plaintiff should be allowed to inquire into

any discoverable information related to the destruction or removal of documents after its first FOIA request was filed.").

**<u>CONCLUSION</u>**

Accordingly, for the all the reasons stated above, plaintiffs respectfully request that this motion for discovery be allowed, and that the Court authorize plaintiffs to take the discovery identified herein within a 90-day period, subject to extension for good cause shown.

Dated: December 22, 2022                            Respectfully submitted,

*/s/ Daniel L. McFadden*
Daniel L. McFadden (BBO #676612)
Matthew R. Segal (BBO #654489)
American Civil Liberties Union
Foundation of Massachusetts, Inc.
One Center Plaza, Suite 850
Boston, MA 02108
(617) 482-3170
dmcfadden@aclum.org

*Counsel for Plaintiff American Civil Liberties Union of Massachusetts, Inc.*

*/s/ Katherine M. Anthony*
Katherine M. Anthony (BBO #685150)
AMERICAN OVERSIGHT
1030 15th Street NW, B255
Washington, DC 20005
(202) 897-3918
katherine.anthony@americanoversight.org

*Counsel for Plaintiff American Oversight*